FILED

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| DONNIE WILLIAMSON, MELISSA STINI, and JENNIFER HOGENCAMP, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>LUMBER LIQUIDATORS HOLDINGS, INC.,<br><br>Defendant. | 2013 DEC -3 P 1:41<br><br>Case No. 1:13cv1487<br>CLERK US DISTRICT COURT<br>ALEXANDRIA, VIRGINIA<br>AJT / TCB<br><br>CLASS ACTION<br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs Donnie Williamson, Melissa Stini, and Jennifer Hogencamp (collectively, "Plaintiffs," unless otherwise specified), individually and on behalf of all others similarly situated (the "Class," as more fully defined below), allege the following against defendant Lumber Liquidators Holdings, Inc. ("Lumber Liquidators," the "Company," or "Defendant"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon, among other things, their attorneys' investigation.

## I. INTRODUCTION

1.       This is a proposed class action brought by Plaintiffs on behalf of themselves and the below-defined Class against Lumber Liquidators to obtain damages and injunctive relief arising from and relating to their purchase and installation of Lumber Liquidators' Chinese wood flooring materials ("Chinese Flooring").

2.       This action arises out of Lumber Liquidators' scheme to import into the United States, and to falsely warrant, advertise, and sell, Chinese Flooring that fails to comply with

relevant and applicable formaldehyde standards (discussed more further below) and the Lacey Act, 16 U.S.C. §§3371, *et seq.*, as well as its breaches of express and implied warranties with respect to these products.

3.      In particular, in contrast to its direct representations to the contrary, Lumber Liquidators manufactures, sells, and distributes Chinese Flooring that emits and off-gasses excessive levels of formaldehyde, which is categorized as a known human carcinogen by the United States National Toxicology Program and the International Agency for Research on Cancer.

4.      Indeed, contrary to Lumber Liquidators' repeated, detailed representations that its flooring complies with strict formaldehyde standards on its product labels, website, and elsewhere, the toxic formaldehyde emissions from the Company's Chinese Flooring products are multiple times the maximum permissible limits set by those standards at the time of purchase.

5.      In addition, and in contrast to its direct representations to the contrary, Lumber Liquidators manufactures, sells, and distributes wood flooring which is illegally sourced through China from other countries (including Russia), threatening critical habitat and endangered species, in violation of the Lacey Act.

6.      Lumber Liquidators' disregard for applicable laws and regulations was recently made apparent when the Company's headquarters in Virginia, as well as a second location, were raided by federal special agents acting on behalf of the Immigration and Customs Enforcement's ("ICE") Homeland Security Investigations unit, the U.S. Fish and Wildlife Service, and the Department of Justice.

7.      Defendant's illegal behavior with respect to its manufacturing, marketing, and sale of Chinese Flooring has caused Plaintiffs and the other Class members to suffer direct

financial harm. Plaintiffs' purchases, by failing to comply with the plain warranties of the Chinese Flooring, is markedly less valuable because of its elevated level of formaldehyde as well as having been sourced illegally in violation of the Lacey Act. Plaintiffs would have paid significantly less, if they purchased Chinese Flooring at all, had they known that the products were sourced from endangered habitats and contained elevated levels of the toxin formaldehyde.

8.     Plaintiffs assert claims individually and on behalf of the other members of the proposed Class for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); Magnuson-Moss Warranty Act; breach of express and implied warranty; violation of state Consumer Protection/Deceptive Practices acts; and unjust enrichment arising from Defendant's scheme to import and sell the Chinese Flooring products at issue here.

## II. JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). The aggregated claims of the individual Class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a case in which Plaintiffs and the other Class members, on the one hand, and Lumber Liquidators, on the other, are citizens of different states. This Court also has jurisdiction over the action pursuant to 18 U.S.C. § 1964 (RICO).

10.    This Court has jurisdiction over Lumber Liquidators because the Company maintains its principal headquarters in Virginia, is registered to conduct business in Virginia, and has sufficient minimum contacts in Virginia. Lumber Liquidators intentionally avails itself of the Virginia consumer market through the promotion, sale, marketing, and distribution of its products to Virginia residents. As a result, jurisdiction in this Court is proper and necessary. Moreover, Lumber Liquidators' wrongful conduct, as described herein, emanates from Virginia

and foreseeably affects consumers in Virginia and nationwide. Most, if not all, of the events and decisions complained of below occurred in or emanated from Lumber Liquidators' corporate headquarters located in Virginia.

11.     Venue is proper in this District under 28 U.S.C. § 1391 (a)-(d) because, among other things, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

## III. PARTIES

### A.    PLAINTIFFS

12.     Donnie Williamson ("Williamson") is, and at all relevant times has been, a resident and citizen of Florida. In or about December 2012, Williamson purchased Mayflower Birch brand flooring directly from Defendant, which was installed in his home. This flooring was manufactured in China. At the time of purchase, Lumber Liquidators falsely represented and warranted the flooring to be compliant with strict formaldehyde standards, as well as that the flooring was manufactured in compliance with the Lacey Act. Williamson relied on Lumber Liquidators' misrepresentations regarding its compliance with U.S. laws and regulations when deciding to purchase flooring and, as a result, paid more for this product than he would have and/or would not have purchased the product but for Defendant's deceptive conduct.

13.     Melissa Stini ("Stini") is, and at all relevant times has been, a resident and citizen of Texas. In or about July 2013, Stini purchased Morningstar Bamboo flooring directly from Defendant, which was installed in her home in August 2013. This flooring was manufactured in China. At the time of purchase, Lumber Liquidators falsely represented and warranted the flooring to be compliant with strict formaldehyde standards, as well as that the flooring was

4

manufactured in compliance with the Lacey Act. Stini relied on Lumber Liquidators' misrepresentations regarding its compliance with U.S. laws and regulations when deciding to purchase flooring and, as a result, paid more for this product than she would have and/or would not have purchased the product but for Defendant's deceptive conduct.

14.     Jennifer Hogencamp ("Hogencamp") is and at all relevant times has been a resident and citizen of Massachusetts. In or about February 2011, Hogencamp purchased Dream Home - St. James 12 mm Blacksburg Barn Board brand flooring directly from Defendant, which was installed in her home. In or about July 2012, Hogencamp also purchased and installed other Lumber Liquidators' products that were manufactured in China in property she owns in Hyannis, MA. At the time of these purchases, Lumber Liquidators falsely represented and warranted the flooring to be compliant with strict formaldehyde standards, as well as manufactured in compliance with the Lacey Act. Hogencamp relied on Lumber Liquidators' misrepresentations regarding its compliance with U.S. laws and regulations when deciding to purchase flooring and, as a result, paid more for this product than she would have and/or would not have purchased the product but for Defendant's deceptive conduct.

**B       DEFENDANT**

15.     Lumber Liquidators Holding, Inc. is a Delaware corporation with its principal executive offices located at 3000 John Deere Road, Toano, Virginia 23168.

16.     Lumber Liquidators is one of the largest specialty retailers of hardwood flooring in the United States. The Company sells primarily to homeowners directly or to contractors acting on behalf of homeowners through its network of approximately 300 retail stores in 46 states. The Company also provides customer sales over the Internet, which are then shipped to a retail store for pickup.

17.     Lumber Liquidators has mills in, and buys many of its source wood flooring material from, China. In 2011, Lumber Liquidators acquired another company's assets related to quality control and assurance, product development, and logistics operations in China.   In connection with the transaction, the Company established a representative office in Shanghai, China and assumed "direct control" of all of its product sourcing in China (through its headquarters in China).

18.     In its 2012 Annual Report filed with the Securities and Exchange Commission on Form 10-K on February 20, 2013, Lumber Liquidators admitted that its "experience with the legal and regulatory practices and requirements in China is *limited*."[1]

## IV. FACTUAL BACKGROUND

19.     Lumber Liquidators sells primarily to homeowners directly or to contractors acting on behalf of homeowners through its network of approximately 300 retail stores in 46 states. Consumers may also purchase the Company's products online, and any purchases made over the Internet are shipped to the Lumber Liquidators retail location of the customers choosing.

20.     Lumber Liquidators began in 1993 when Tom Sullivan, a building contractor, began purchasing excess wood and reselling it from the back of a trucking yard in Stoughton, Massachusetts. The Company eventually focused on hardwood flooring. The Company's first store opened on January 5, 1996 in West Roxbury, Massachusetts. Eight months later, a second store opened in Hartford, Connecticut, and from there the Company expanded exponentially.

21.     The Company moved headquarters from Boston to Colonial Heights, Virginia in 1999. In 2004, the Company moved its headquarters to its current location, a 306,000 square foot production center in Toano, Virginia.

---

[1] Unless otherwise noted, emphasis in quotations has been added by counsel.

22.     Lumber Liquidators prides itself on having one of the largest inventories of prefinished and unfinished hardwood floors in the industry. Lumber Liquidators carries solid and engineered hardwood, laminate flooring, bamboo flooring, cork flooring and resilient vinyl flooring, butcher blocks, molding, accessories, and tools.

23.     Lumber Liquidators represents that it negotiates directly with the lumber mills, eliminating the middleman and passing the savings on to its customers. The Company also represents and warrants that it is "environmentally conscientious" and "only purchases from suppliers who practice sustainable harvesting, which allows forests to heal and re-grow faster."

24.     In 2012, Lumber Liquidators had over 1,400 employees and revenue of over $800 million.

25.     Unfortunately, one of the primary reasons Lumber Liquidators has grown so quickly and its profits have surged has been through the Company's misrepresentations about the formaldehyde levels of its products and through its sourcing of cheap (and illegal) lumber from China.

26.     Moreover, given its admitted "limited" understanding of the legal and regulatory practices in China, it is not surprising that Defendant's Chinese Flooring products fail to comply with Lumber Liquidators' representations about these products.

A.      **FORMALDEHYDE**

27.     Contrary to its representations to Plaintiffs and the other Class members, Lumber Liquidators has knowingly and intentionally engaged in a scheme to source, manufacture, sell, and distribute falsely advertised Chinese Flooring that emits excessively high levels of formaldehyde.

7

28.     Formaldehyde ($CH_2O$) is a naturally occurring chemical that can be synthesized and used in certain industrial processes.

29.     Formaldehyde is classified as a volatile organic compound ("VOC"), which is a chemical that becomes a gas at room temperature. It is listed as a known human carcinogen by the National Toxicology Program and the International Agency for Research on Cancer and is associated with myriad other adverse medical conditions even in short term exposure, including asthma and rheumatoid arthritis.

30.     According to the U.S. Occupational Safety & Health Administration ("OSHA"):

[t]he concentration of formaldehyde that is immediately dangerous to life and health is 100 ppm. Concentrations above 50 ppm can cause severe pulmonary reactions within minutes. These include pulmonary edema, pneumonia, and bronchial irritation which can result in death. Concentrations above 5 ppm readily cause lower airway irritation characterized by cough, chest tightness and wheezing.

Long term exposure has been linked to an increased risk of cancer of the nose and accessory sinuses, nasopharyngeal and oropharyngeal cancer, and lung cancer in humans.[2]

31.     Formaldehyde has a pungent odor and irritates the respiratory tract. The most common symptoms of formaldehyde exposure are burning eyes, nose and throat irritation, coughing, headaches, dizziness, joint pain, and nausea. Due to the harmful effects of formaldehyde on human health, various laws have been enacted to reduce consumers' exposure to this toxin.

32.     Wood flooring can contain formaldehyde because formaldehyde is often used in the adhesives and resins used to make engineered wood floors. Formaldehyde can be released into the air (through a process called "off-gassing") from wood flooring materials.

---

[2] https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=standards&p_id=10078

33.     According to the Consumer Product Safety Commission ("CPSC"), pressed-wood (*i.e.*, hardwood plywood, particleboard, and medium-density fiberboard ("MDF")) and wood-based products, especially those containing urea-formaldehyde (or "UF") resins, may be "a significant formaldehyde source."

34.     Many, if not all, of Lumber Liquidators' Chinese Flooring products contain UF/urea-formaldehyde or other formaldehyde resins.  For example, the Material Safety Data Sheet for Lumber Liquidators' Morning Star Bamboo Flooring states:   "This product is composed of bamboo fibers bonded together with urea formaldehyde (UF) resins."  UF makes up 10-11% of the product.

35.     Chinese-sourced wood products (including Lumber Liquidators' Chinese Flooring) are particularly associated with excess formaldehyde levels.

36.     For example, in February 2012, the leading Chinese hardwood flooring company, Anxin Weiguang Flooring, was forced to pull its wood flooring products from shelves pending an investigation by Shanghai's Bureau of Supervision, Inspection and Quarantine because of claims that the flooring emitted excessive levels of formaldehyde.

37.     One study, entitled "Formaldehyde in China: Production, consumption, exposure levels, and health effects," *Environment International* 35 (2009) 1210–1224, found that over the last 20 years, China's formaldehyde industry has experienced unprecedented growth, and now produces and consumes *one-third* of the world's formaldehyde.  More than 65% of the Chinese formaldehyde output is used to produce resins which are mainly found in wood products.  These are also the major source of indoor air pollution in China.  The study documented numerous instances of hazardous occupational exposure to formaldehyde in Chinese wood workers.

38. Chinese regulations governing formaldehyde in wood products are virtually non-existent. As a result, wood sourced from China is not subject to the strict environmental regulations that would govern such wood products manufactured in the United States.

39. The California Air Resources Board ("CARB") is a department of the California Environmental Protection Agency. CARB's mission is to promote and protect public health, welfare, and ecological resources through effective reduction of air pollutants while recognizing and considering effects on the economy. CARB oversees all air pollution control efforts in California to attain and maintain health-based air quality standards. Additionally, CARB mandates are typically the model for national standards. For example, the Environmental Protection Agency and the Department of Transportation coordinated their most recent round of proposed rules with CARB. CARB has served as the model for the federal standard in formaldehyde emissions as well.

40. CARB promulgated the Airborne Toxic Control Measure to Reduce Formaldehyde Emissions from Composite Wood Products, California Code of Regulations, Title 17, §§ 93120-93120.12 (the "CARB Regulations"), in January 2009. The CARB Regulations apply to a range of composite wood products, including flooring, hardwood plywood, particleboard and fiberboard. The CARB regulations (phase 2) dictate that certain wood products sold in the State of California must emit no more than 0.05 parts per million of formaldehyde as determined per relevant testing methods.

41. The United States statute that governs permissible formaldehyde emissions, the Formaldehyde Standards for Composite Wood Products Act of 2010, 15 U.S.C. 2697 (the "Formaldehyde Standards Act"), was signed into law on July 7, 2010. The Formaldehyde Standards Act adopted the standards established by CARB as a nationwide standard. The

comment period for the two proposed regulations that will implement the Formaldehyde Standards Act recently concluded and the implementation of these standards is forthcoming.

42.     Lumber Liquidators' marketing materials, including the Company's website, specifically represent to consumers that the Company's Chinese Flooring products comply with the formaldehyde emission regulations propounded by CARB and, indeed, comply with even stricter European Union ("EU") formaldehyde standards:

> ***All laminates and engineered flooring products sold by Lumber Liquidators are purchased from mills whose production method has been certified by a Third Party Certifier approved by the State of California to meet the CARB standards.*** The scope of the certification by the Third Party Certifier includes the confirmation that the manufacturer has implemented the quality systems, process controls, and testing procedures outlined by CARB and that their products conform to the specified formaldehyde emission limits. The Third Party Certifier also provides ongoing oversight to validate the manufacturers' compliance and manufacturers must be periodically re-certified.
>
> Though it currently applies only to products sold in California, ***Lumber Liquidators made a decision to require all of our suppliers to comply with CARB regardless of whether we intended to sell the products in California or any other state/country. In addition, our suppliers manufacture their products in accordance with the European standard which has stricter guidelines than the California*** [sic].
>
> In addition to the CARB requirements, ***Lumber Liquidators regularly selects one or more products from each of its suppliers and submits them for independent third-party lab testing.*** This is done as a monitoring activity to validate ongoing compliance.[3]

43.     In addition, on the product packaging of the Chinese Flooring products at issue in this case, Defendant represents and warrants that its Chinese Flooring complies with CARB Phase 2 Formaldehyde standards:

---

[3] http://www.lumberliquidators.com/ll/flooring/Flooring101-formaldehyde-what-is-it.

*Illustration #1:*



*Illustration #2:*



44.     Moreover, Lumber Liquidators' Purchase Order Terms and Conditions, which are readily available on the Company's website, provide the following warranties:

SELLER'S WARRANTIES: *Seller expressly warrants that all goods covered by this Purchase Order will: (a) strictly conform to Seller's specifications, drawings, samples and other written materials and descriptions . . . .*

*In addition, Seller warrants that: (e) none of the goods covered hereby, to the extent they are subject to laws prohibiting adulteration or misbranding, is adulterated or misbranded within the meaning of such laws as of the date of delivery to Lumber Liquidators; (f) all goods covered hereby may be introduced into the stream of commerce without violation of applicable laws and regulations; and (g) all goods furnished or supplied pursuant to this Purchase Order have been sourced, produced, sold, delivered, declared, packaged, labeled, manufactured, and/or rendered to Lumber Liquidators in compliance with all applicable laws, codes and regulations.*[4]

45.     This warranty applies to all Lumber Liquidators products.

46.     In addition, each of Lumber Liquidators' products is covered by a warranty stating that the flooring will be free from defects.  For example, the Mayflower Engineered Limited Warranty states that: *"Mayflower engineered prefinished hardwood floors are crafted to meet the industry's highest quality standards and are carefully manufactured to ensure they are free of defects.  Each board is meticulously inspected before and after the finishing process to make sure it complies with Mayflower's unwavering standards."*  Each of the warranties at issue here contains the same, or substantially similar, statements representing that the products are "free of defects."

47.     Contrary to Lumber Liquidators' repeated, detailed representations and warranties, however, its Chinese Flooring products off-gas formaldehyde at the time of purchase at levels that far exceed the standards propounded by CARB and the EU resulting in harm to Plaintiffs and the other Class members who purchased these products.

48.     The truth regarding Lumber Liquidators' flooring began to emerge on June 20, 2013, when blogger Xuhua Zhou ("Zhou") of the website *Seeking Alpha* first published the

---

[4]   http://www.lumberliquidators.com/ll/customer-care/potc800201.

results of his independent investigation of the formaldehyde levels present in Lumber Liquidators' flooring.

49.     Mr. Zhou sent off samples of Lumber Liquidators' Chinese Flooring to be tested.[5] Two separate and independent accredited testing laboratories confirmed that the Chinese Flooring manufactured, distributed, and sold by Lumber Liquidators emitted and off-gassed formaldehyde at levels *far exceeding* the CARB (and EU) formaldehyde limits.

50.     As Zhou explained:

> I recently conducted independent lab testing - engaging Berkeley Analytical, an IAS accredited testing laboratory - on a sample of Lumber Liquidators house brand flooring ("Mayflower" brand), and the results that came back weren't pretty: ***Over 3.5x the maximum legal level for formaldehyde.*** (This product was purchased retail from a Southern California retail store.) Fully understanding the importance of this finding, we submitted samples from the same package to a second laboratory, this one the "gold standard" lab for the National Wood Flooring Association, NTA. ***This second lab confirms the product is in violation of the legal limit for formaldehyde.***
>
> * * * * *
>
> The tested product, Mayflower 5/16" x 5" Bund Birch Engineered, emits a staggering three and half times over the government mandated maximum emission level. The product is clearly not CARB compliant yet Lumber Liquidators tagged CARB compliance on the box.

51.     Rather than respond to or acknowledge the testing results, Lumber Liquidators initiated a clearance sale to offload its existing inventories on consumers. As Zhou explained in a follow-up article dated June 24, 2013:

> Despite having offered to send the company my noncompliant sample and the relevant lab reports, I have yet to correspond with anyone from Lumber Liquidators. Instead, ***Lumber Liquidators initiated an End of Quarter CLEARANCE sale for all its flooring products per a marketing email received this Sunday. The company chose not to follow up on credible questions raised about its product safety and instead launched a marketing sales campaign to get rid of existing inventory faster.*** It could be that Lumber Liquidators management

---

[5] Zhou disclosed that he held short positions in the Company's stock at the time of his report.

needs to make analyst projections for the second quarter or it may be trying to unload all noncompliant inventories before the California Air Resource Board starts to crack down on the issue. Regardless of the rationale, it is hardly a responsible decision on the part of Lumber Liquidators.[6]

52.     Zhou also preserved his Chinese Flooring and directly asked Lumber Liquidators to contact him and conduct its own testing. Although the Company was undoubtedly aware of his request given the widespread publicity his report received, Lumber Liquidators never followed up with him to request his results.

53.     Zhou's findings are similar to the experiences of Plaintiffs and other purchasers of Lumber Liquidators' Chinese Flooring. A sampling of message board forums for homeowners and builders reveal that several other purchasers have also raised formaldehyde concerns about Defendant's wood flooring products:[7]

54.     Sandra of Vienna, VA on May 30, 2013:

Recently, I had bamboo flooring from Lumber Liquidator installed on Memorial Day, 27th May 2013. The flooring is carbonized strand bamboo, 500 sq. ft. installed. I noticed the odor as the installation took place and found it quite peculiar. I chalked it up as a new product odor especially since the planks just came out of the boxes. Within the next 48 hours I realized it was not a temporary odor. I have burning nostrils; my face feels like it is stinging, and I'm having a dull headache. Yet, when I leave the house, the above symptoms disappear.

The smell has permeated the house and the odor is noxious. I had to close the intake air conditioner vent in that room. I believe the bamboo wood has a high level of formaldehyde. What is LL's past experience in dealing with customers who are allergic to the emitted toxic fumes from the wood? Do they refund/replace the wood? Are the formaldehyde levels carcinogenic? What is the bottom line from LL for assisting their customers who become sick from bamboo they import from China??? How informed are consumers about the constant emission of toxic fumes from LL wooden floor? What is LL doing about the

---

[6] Xuhua Zhou, *Lumber Liquidators – Management's Silence and Broker's Rebuttal May Validate Worst Fear*, Seeking Alpha, available at http://seekingalpha.com/article/1517322-lumber-liquidators-managements-silence-and-brokers-rebuttal-may-validate-the-worst-fear

[7] All quotes have been reproduced directly as written in their respective publications, without the delineation of [*sic*] for any specific typographical, spelling, or syntax error.

problem? Do they care or they are only concerned with their bottom line... the Almighty Dollar? Class action lawsuit anyone???[8]

55.     A similar post by "rg100" on March 25, 2012 at 2:06 states:

I purchased morning star bamboo strand click flooring from Lumber Liquidators. Little did I know that it would release a bad acidic odor which will not go away, it actually made me sick. I paid someone to install it and now i have to take the flooring out and LL wont give a full refund and is charging 20% restock fee. After researching i found out that LL is aware of the problem and does not disclose it to consumers who are purchasing the product.[9]

56.     Lumber Liquidators responded to rg100's March 25, 2012 post above, stating that

once a consumer installed Lumber Liquidators' Chinese Flooring products, they were left with

no recourse. Posted by "Directorcustcare444" on March 31, 2012 at 9:28:

We're sorry to hear you're dissatisfied. No matter where you source bamboo, some items may need to "gas off" as other postings note. The process simply means the packaged material once unpackaged and allowed to adjust to the rooms temperature and humidity will begin to normalize and the scent will dissipate. Installed material is deemed accepted and the problem you shared is not one common as a concern raised by consumers. We sell thousands of sq ft of this material each week and would be flooded with this type of concern if it was truly a broader issue. The care instructions are as follows: HANDLE WITH CARE To prevent board warping or bowing; do not cut the packaging plastic support bindings until ready to install. Do not stand flooring on ends or sides. Do not store directly on bare concrete or next to outside walls. Cartons should be placed as close to the center of the installation area as possible. Store flat supporting to the ends and center sections. Store in a dry place being sure to provide air flow under and around cartons. Keep out of direct sunlight and away from air vents. You regulation of interior conditions may be a contributing factor. All wood items have their own "smells" and if this was an issue it would be known as the product was removed from the box and the invoice states we will take product back. Fully installed material is accepted, so you failed to follow these instructions and we regret this ended up leaving you dissatisfied. *This case highlights the importance of reading and following these detailed instructions.*[10]

---

[8] http://www.consumeraffairs.com/homeowners/lumber_liquidators.html

[9] http://ths.gardenweb.com/forums/load/flooring/msg0302064114023.html

[10] *Id.*

16

57.    Flabbergasted by Lumber Liquidators' response, "rg100" responded on April 4, 2012 at 11:26 by stating:

> are you kiding me with your post directorcustcare444?? The instructions were followed, and you tell me that its my fault your bamboo product outgases formaldehyde?? Which is defined as "A gas at room temperature, formaldehyde is colorless and has a characteristic pungent, irritating odor etc...In view of its widespread use, toxicity and volatility, exposure to formaldehyde is a significant consideration for human health.... On 10 June 2011, the US National Toxicology Program has described formaldehyde as "known to be a human carcinogen". Is all of this in your instructions that you say i didnt follow? Does it say in your instructions that formaldehyde, a carcinogen, will be released into your home, but according to you its ok because it will eventually go away?[11]

58.    As shown in the Company's response, it was of the utmost importance to read the warranty at the time of purchase and installation, and the warranty contained explicit representations that the Chinese Flooring did not violate the Lacey Act, nor did it off-gas formaldehyde in violation of CARB standards.

59.    Other purchasers of the Company's products experienced similar problems with their flooring, and were also unsuccessful in receiving the clear protections set forth in the Lumber Liquidators warranty. Posted by "odinfang" on Jan. 6, 2013 at 17:35:

> my husband and I also purchased this bamboo flooring in Sept 2012....not only is it seperating EVERYWHERE....but the odor is also making my husband and I sick!!!!!!!!!!!!!!!!!!we paid $325 to have an inspector come out and we are getting ready to take legal action....our attorney is reviewing all our documents as we speak.....I could not believe it today when I found all the rest of you poor people that are also suffering. It makes me sooo upset that LL has known about the problem since at least 2006 and they are till getting away with selling it!!! Lets do something about this.....[12]

60.    Moreover, "Customer" posted in or about August 2013:

smell from laminate flooring

---

[11] *Id.*

[12] *Id.*

I bought 466 square feet of laminate flooring for over $1000 and am not able to install it because of the overwhelming toxic fumes it produces. I kept it for weeks in a spare room hoping it would out gas on its own but now the whole house stinks. I have to throw it out before we become ill. They have to know these products made in China have way too much formaldehyde in them. I would never buy from them again.[13]

61.    Similarly, "Employee" posted in or about August 2013:

Ripof company.   We will never honor our warranty. The consumer is basically screwed[14]

62.    Thereafter, "smithmiller6" posted on April 3, 2010 at 1:29 pm as follows:

Sick of bamboo floor fumes problem

If one has installed a bamboo floor and had trouble with fumes? We purchased Morning Star Bamboo from Lumber Liquidators and installed it in a bedroom. We had planned to do the whole second floor with it but had installation delays--luckily! We noticed a strange, acrid odor right after installation.  We weren't using the room much, though, so it wasn't a problem.  We just left the window open for a few days, thinking that would take care of it.  Well, a couple months later we moved in and the fumes were AWFUL--I mean, make your eyes tear and your nose burn awful.  For the past month we have been venting the room with a fan to the outside, but it doesn't seem to be doing much good. We've been sleeping in this room and if we can't ventilate it for at least ten hours first (and we often can't now that the weather is getting so cold) then I wake up with a burning nose and a headache and my husband's eyes swell up. This product supposedly meets "more stringent" European emission standards, but it is definitely causing a health issue for us--perhaps not for folks who don't have allergies or sensitivities or whatever, but for us it is a big problem. LL will not take what's left back. I'm wondering if anyone else has had similar problems with bamboo products and whether they've been able to mitigate it. I don't really want to continue with the installation, but if LL continues to balk at taking it back, we're not sure what we'll do...looking into other flooring options, but if we're saddled with this bamboo, we may not have $$ left over to do anything with this floor and may have to do what we can with ventilating whenever we can! If this is a known health issue with these floors, though, and not "just us" (I do have a type of migraine that makes me sensitive to chemicals) then we want to push LL both to take this stuff back and to stop selling it![15]

---

[13] http://www.hallway.com/companies/lumber-liquidators-inc-employee-reviews?nt=16382&page=1
[14] *Id.*
[15] http://www.plumbingforums.com/forum/f4/sick-bamboo-floor-fumes-problem-415/

63.     "Tommy," on January 6, 2011, posted:

We bought 1600sf Bellawood floor from Lumber Liquidators and installed it in
our house. Right after the installation, my family started suffering irritated eyes,
skin rash, and burning throat, respiratory stress. Indoor air testing showed the
formaldehyde level was above 0.2ppm, which is 25 time higher than the normal
level (0.008ppm). We have to move to other place to avoid exposure. The Lumber
Liquidators and their insurance company Liberty Mutual kicked the ball back and
forth, and made us a homeless for 8 months. I would like to tell other customers
of Lumber Liquidators, if you are suffering some respirotary symptoms, check the
Formaldehyde level in your house. If you are going to buy products from Lumber
Liquidator, please think about my experience.[16]

64.     The foregoing complaints are representative of the experiences and views of
consumers purchasing product from Lumber Liquidators and represent a small fraction of
purchaser complaints.

65.     Unsurprisingly, Consumer Affairs, a leading consumer news and advocacy
organization, gives Lumber Liquidators an "Overall Satisfaction Rating" of just one out of five
stars, based on nearly eighty customer reviews.[17]   In fact, *not a single consumer* rated the
Company with either 5 or 4 stars, and *89% percent* of respondents allotted Lumber Liquidators a
single star, the lowest possible rating.

66.     It is beyond reasonable dispute that Lumber Liquidators knew of many of these
posted customer complaints. For example, as noted above, the Company actually responded to
at least one of the complaints and specifically told customers "*the importance of reading and
following . . . these detailed instructions,*" which are included with the false representations
regarding the Company's compliance with CARB and EU formaldehyde standards (as well as
the Lacey Act).

---

[16] http://www.complaintsboard.com/complaints/lumber-liquidators-c407349.html

[17] http://www.consumeraffairs.com/homeowners/lumber_liquidators.html

67.     Nevertheless, Lumber Liquidators continued to misrepresent that its Chinese Flooring products were CARB and EU compliant when it knew that this was false, downplayed the formaldehyde off-gassing defect of its Chinese wood products, and failed to properly investigate and inform customers regarding the formaldehyde emissions problems associated with its products.

68.     Further, Lumber Liquidators, along with co-conspirators discussed *infra*, continues its illegal scheme to purchase from Chinese manufacturers and import into the United States cheap, non-compliant flooring and falsely advertise that the flooring complies with state, federal, and international standards.

69.     Had Defendant adequately and fairly represented its products, Plaintiffs and the other Class members would not have purchased these products and/or would have paid less money for them.

**B.     PRODUCT SOURCING – LACEY ACT VIOLATIONS**

70.     Aside from excessive and illegal formaldehyde off-gassing, Lumber Liquidators' Chinese Flooring products also violate the Lacey Act, in contrast to the direct representations and warranties that Lumber Liquidators has made about these products.

71.     Originally passed in 1900, the Lacey Act originally made it a federal crime to poach game in one state with the purpose of selling the bounty in another.  The Lacey Act was amended on May 22, 2008, when the Food, Conservation, and Energy Act of 2008 expanded its protection to a broader range of plants and plant products, including timber (Section 8204, Prevention of Illegal Logging Practices).

72.     Of particular importance here is that the 2008 amendments to the Lacey Act made it illegal to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign

20

commerce timber taken or traded in violation of the laws of the U.S., a U.S. State, or relevant foreign law.

73. The following are examples of what is considered illegal under the Lacey Act: (a) theft of timber, including from parks and protected areas; (b) harvesting timber without permission; (c) failure to comply with timber harvesting regulations; and (d) failure to pay timber royalties, taxes or fees.

74. The Lacey Act also makes it unlawful to make or submit any false record, account, or label for, or any false identification of, any timber products. It is also unlawful, as of December 15, 2008, to import any covered timber products without a declaration form collected by Customs and Border Protection of the Department of Homeland Security.

75. The U.S. Government requires that such declaration forms contain: (a) the scientific name of the plant (including genus and species); (b) the value of importation; (c) the quantity of the plant; and (d) the country of origin from which the plant was harvested.

76. Penalties for Lacey Act violations include civil fines of up to $10,000 per violation, criminal penalties (including additional fines and jail time), and forfeiture.

77. Lumber Liquidators specifically represents and warrants on its website that it engages in extensive efforts to insure environmentally-responsible sourcing and manufacturing of flooring and, specifically, that it is in strict compliance with the Lacey Act:

> Lumber Liquidators is committed to responsible business practices as a central operating philosophy of our company. To that end, *our lumber sourcing complies with U.S. laws and regulations including the Lacey Act, which prohibits the illegal trade of wildlife, fish, and plants, including lumber.*
>
> In addition, we work directly with a select group of vendors and mills with whom *we have cultivated long-standing relationships to ensure the legal and environmentally-responsible sourcing and production of our products.* Our suppliers agree to comply with our Supplier Code of Conduct with Respect to Environmental and Social Responsibility which requires, among other things, that

21

their operations and the products they supply to us comply with all national and other applicable laws and regulations for the countries in which they operate.

*We visit our suppliers' mills and forests and assess their adherence to our code of conduct and its protocols concerning environmental, labor and health and safety matters.* In the past, we have stopped using certain suppliers because we were not satisfied with the credibility of their responses to detailed questions about compliance issues and we regularly decline to pursue business with potential new suppliers that cannot provide evidence of compliance with applicable laws and regulations. [18]

78.     In addition, and as discussed above, Lumber Liquidators specifically represents and warrants, as part of every sale, that all goods "have been sourced, produced, sold, delivered, declared, packaged, labeled, manufactured, and/or rendered to Lumber Liquidators in compliance with all applicable laws, codes and regulations."

79.     On September 26, 2013, however, the Company's headquarters in Toano, Virginia and another corporate location in neighboring Richmond, Virginia, were raided by United States Federal Special Agents acting on behalf of the ICE's Homeland Security Investigations unit, the U.S. Fish and Wildlife Service, and the Department of Justice.

80.     Although the details of the federal investigations (including affidavits and search warrants) remain sealed, according to *The Wall Street Journal*, the raid seized evidence that Lumber Liquidators is importing wood products harvested from forests in eastern Russia (which are then processed across the border in China) that are the habitat of critically endangered wildlife species, including the Siberian tiger, of which there are an estimated 450 remaining in the world.[19]   In particular, the investigations are focused on Lumber Liquidators' alleged violations of the Lacey Act prohibitions against illegal harvesting of timber.

---

[18] http://m.lumberliquidators.com/view_question!PAGETYPE?sf=101133&documentid=378812&action
=view

[19] http://online.wsj.com/article/SB10001424052702303342104579101042712448428.html

81.    An in-depth, comprehensive investigative report released by the Environmental Investigation Agency (the "EIA") on October 9, 2013 (the "EIA Report") corroborates that Lumber Liquidators is illegally sourcing wood from the protected old growth hardwood forests of Russia (which is then sold by Lumber Liquidators as Chinese Flooring) in violation of the Lacey Act and Lumber Liquidators' warranties and representations to the contrary.

82.    The EIA report, titled "Liquidating the Forests: Hardwood Flooring, Organized Crime and the World's Last Siberian Tigers," resulted from a three-year-long investigation and confirms that Chinese manufacturers are colluding with illegal loggers in Russia to launder trees harvested outside legal concessions in Russia.

83.    As the EIA report relates, early in undercover visits and conversations, the president of Suidenhe Xingjia Economic and Trade Company described his company's numerous instances of illegal logging, extensive knowledge of illegal operations throughout the Russian forest sector, and bribing of local officials. Through an analysis of U.S. import records, EIA also found that Lumber Liquidators is one of Xingjia's *largest* customers.

84.    As explained by the EIA:

The [EIA] identified the worst actors in the Russian Far East and tracked their particular shipments. We quickly found the company with the most serious and direct links to illegal logging in [the] Khabarovsk [Province of Russia], the last frontier of old-growth hardwoods in the region. After a series of undercover visits posing as buyers, we were dismayed to find that its biggest customer was in fact the largest retailer of hardwood flooring in the United States, Lumber Liquidators.

* * * * *

During a multi-year investigation by the [EIA], Lumber Liquidators, the largest specialty retailer of hardwood flooring in the United States, emerged as the strongest example of a U.S. company whose indiscriminate sourcing practices link U.S. consumers to the destruction of critically endangered tiger habitat and forests in the [Russian Far East (also referred to as the "RFE")]. While making record profits in recent years, Lumber Liquidators has turned a blind eye as its purchases have fueled rampant illegal logging in the region.

23

85.     The EIA Report further explains that 96% of the wood illegally harvested from the RFE is transported over the border into China for processing. In addition, the EIA Report cites compelling evidence that Lumber Liquidators either knew or should have known that the flooring it purchased from these Chinese plants was illegally sourced from Russia:

> Lumber Liquidators has sourced hardwood flooring from Xingjia [a Chinese company described as "the dominant player in the cross-border trade of valuable Russian hardwoods"] since at least 2007. Beginning in 2011, the U.S. company has worked to strengthen its control over its global supply chain through the purchase of their Shanghai-based logistics and quality control manager and streamlining of sourcing through fewer suppliers. Over the past five years, Lumber Liquidators has continued to deepen its relationship with Xingjia, including reportedly visiting their mills in the [RFE] in May 2012. During their first face-to-face meeting, Xingjia's president told EIA investigators posing as buyers that much of their wood was illegal. Lumber Liquidators has been a major purchaser of Xingjia's flooring over the past five years. In fact, according to Xingjia's president, just a few weeks after EIA undercover investigators received a tour of Xingjua's operations in Russia, a high-level team from Lumber Liquidators arrived for a similar tour. . . .
>
> EIA's investigation clearly illustrates that Xingjia's oak supplies are riddled with illegal sources and that it is immediately apparent to anybody who asks them where their wood originates.  U.S. import data and statements from Xingjia officials confirms that Lumber Liquidators is far from 'anybody,' and in fact is their single most prominent customer of oak flooring.

86.     Even in the face of the EIA report and the direct knowledge gained by high-level executives of Xingjia's operations, Lumber Liquidators continued sourcing their Chinese Flooring from these illegal products.  The EIA also released a video with footage from the investigation.[20]  The video footage shows undercover members of EIA interviewing Chinese wood flooring manufacturers who launder illegal wood from Russia's Far East forests.  The company officials walk them past pallets of Lumber Liquidators' proprietary Virginia Mill Works brand flooring, as noted in the following screenshot from the EIA footage:[21]

---

[20] http://www.youtube.com/watch?v=UKqwMH2N0vc
[21] It should be noted that 1-800-HARDWOOD is Lumber Liquidators' main phone number.



87.    The manager of Xingjia stated that Lumber Liquidators' upper management toured the facilities and knew where the wood was coming from and that it was cut illegally. Indeed, a representative of EIA stated:

> We saw only a small piece of what Lumber Liquidators saw and we saw that there was illegal wood everywhere. It became clear in our investigation that there is no way that a responsible company, or anybody, could do business with Xingjia without knowing after the first meeting that they were dealing in illegal wood. And we know that Lumber Liquidators has been working with them for at least five years and is now their major customer.

88.    Moreover, the illegal source of the Lumber Liquidators' flooring has been verified through independent testing:

> During visits to Chinese manufacturers, EIA was given samples of boards and manufactured flooring by six companies exporting to the U.S. and EU. Eleven of these samples were provided by representatives from both the Suifenhe and Dalian facilities of Xingjia, the key supplier to Lumber Liquidators. Five of these eleven samples were cut from a batch of flooring which EIA observed Xingjia workers preparing for shipment to Lumber Liquidators. EIA sent these samples to a respected laboratory with decades of expertise in stable isotopic analysis for testing. *Preliminary results from stable isotopic analysis indicate that every sample provided was Russian in origin. For 18 out of 20 of these samples, the analysis gave a confidence level of 95% or greater. These results indicate that*

*all of the samples received from Xingjia were likely sourced from the forests of Khabarovsk Province – the forests where the company claimed to be sourcing, and where their supplier have previously been convicted of, and are currently suspected of, illegal logging.*

89.     Lumber Liquidators sent the following statement in response to the EIA Report on October 10, 2013:

> We are reviewing the report and, while we cannot yet comment specifically on its contents, we believe there are numerous inaccuracies and unsubstantiated claims. Lumber Liquidators is committed to uncompromising integrity in how the Company operates, across all areas of the business. The Company has policies and procedures in place for the sourcing, harvesting and manufacturing of all of its products, monitored by professionals located around the world. Quality and sustainability are key components of Lumber Liquidators' value proposition and the Company invests significant time and resources to safeguard quality control and compliance. Lumber Liquidators seeks to ensure that the Company conducts business ethically and acts in all arenas as a superior corporate citizen. We support the protection of the environment and responsible forest management, and if we find that any of the Company's suppliers are not adhering to our standards, we will discontinue sourcing from those suppliers.

90.     While Lumber Liquidators claims to discontinue sourcing from suppliers who are not "adhering to its standards," this admission reveals that Lumber Liquidators has purchased at least some wood that does not adhere to its standards and representations.  Notably absent from Lumber Liquidators' statement is what it will do for customer who ended up buying this misrepresented, mis-warranted, and/or otherwise misbranded wood.

91.     Lumber Liquidators' flagrant violations of law and systemic warranty breaches have caused, and will continue to cause, significant financial harm to Plaintiffs and the other Class members.

## V. CLASS ACTION ALLEGATIONS

92.     Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all others similarly situated.

93.     The Class that Plaintiffs seek to represent is defined as:

26

> All persons and entities in the United States (including its Territories and the District of Columbia) who purchased and installed wood flooring from Lumber Liquidators Holdings, Inc., either directly or through an agent, that was sourced, processed, or manufactured in China.

Excluded from the Class is Lumber Liquidators, its affiliates, employees, officers and directors, persons or entities that distribute or sell Lumber Liquidators flooring, the Judge(s) assigned to this case and the attorneys of record in this case.

94.    Plaintiffs do not assert claims in this action for personal injuries caused by formaldehyde exposure through the Chinese Flooring in question here.   Rather, Plaintiffs, individually and on behalf of the other Class members, seek solely economic and injunctive relief as a result of their purchase of Lumber Liquidators' Chinese Flooring products.

95.    The members of the Class are so numerous that joinder of all members would be impracticable. The proposed Class likely includes not less than tens of thousands of members dispersed across the United States. The precise numbers of members can be ascertained through discovery, which will include records of Lumber Liquidators' sales, its warranty service, and other records and documents.

96.    There are common questions of law and fact that predominate over any questions affecting only individual Class members.  These common legal and factual questions, include, but are not limited to:

   a.    Whether Lumber Liquidators' Chinese Flooring products emit excessive levels of formaldehyde;

   b.    Whether Lumber Liquidators' Chinese Flooring products were produced in violation of the Lacey Act;

   c.    Whether Lumber Liquidators represented and warranted that its Chinese Flooring products were CARB and EU compliant;

   d.    Whether Lumber Liquidators represented and warranted that its Chinese Flooring products complied with their label descriptions;

e.   Whether Lumber Liquidators omitted and concealed material facts from its communications and disclosures to Plaintiffs and the other Class members regarding the illegal sourcing of its Chinese Flooring products;

f.   Whether Lumber Liquidators has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in connection with its marketing and sale of its Chinese Flooring products;

g.   Whether Lumber Liquidators breached its express or implied warranties to Plaintiffs and the other Class members with respect to its Chinese Flooring products;

h.   Whether, as a result of Lumber Liquidators' conduct, Plaintiffs and the other Class members have suffered damages; and if so, the appropriate measure of damages to which they are entitled; and

i.   Whether, as a result of Lumber Liquidators' misconduct, Plaintiffs and the other Class members are entitled to equitable relief and/or other relief, and, if so, the nature of such relief.

97.   Plaintiffs' claims are typical of the claims of the other Class members. Plaintiffs and each of the other Class members have been injured by the same wrongful practices of Lumber Liquidators. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims and are based on the same legal theories.

98.   Plaintiffs will fully and adequately assert and protect the interests of the other Class members. In addition, Plaintiffs have retained class counsel who are experienced and qualified in prosecuting class action cases similar to this one. Neither Plaintiffs nor their attorneys have any interests contrary to or conflicting with other Class members' interests.

99.   A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the other Class members' claims is economically infeasible and procedurally impracticable. While the damages sustained by Class members in the aggregate are substantial, the individual damages incurred by each Class member are too small to warrant the expense of individual suits. The likelihood of individual Class

members prosecuting their own separate claims is remote, and even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.   Further, individual Class members do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and the court system because of multiple trials of the same factual and legal issues.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

100.   In addition, Lumber Liquidators has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the Class members as a whole is appropriate.

101.   Plaintiffs do not anticipate any difficulty in the management of this litigation. Any manageability concerns can be adequately addressed through various means available to the Court.

102.   Lumber Liquidators has, or has access to, address and other contact information for the Class members, which may be used for the purpose of providing notice of the pendency of this action.

## VI. CLAIMS ALLEGED

### COUNT 1
### (Violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961, *et seq.* -- Formaldehyde)

103.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

104.    Plaintiffs bring this claim individually and on behalf of the other Class members against Lumber Liquidators.

105.    The Racketeering Influenced and Corrupt Organizations Act ("RICO") provides:

It shall be unlawful for any persons employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962(c).

106.    The relevant time period for Defendant's pattern of racketeering stems from at least the year 2009, and likely earlier but at this point in discovery as yet unknown, and continues through the date of the filing of this action and remains ongoing.

107.    Defendant is a "person(s)" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

### THE RICO ENTERPRISE

108.    Defendant has used an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), to carry out the pattern of racketeering activity based on the wrongful conduct alleged herein.

109.    This enterprise consists of Lumber Liquidators, unknown Chinese wood processors, third party certifiers of CARB compliance, and other entities that were associated together for the common purpose of importing into the United States and selling to consumers

30

falsely advertised Chinese Flooring products which failed to comply with applicable formaldehyde standards.

110.    This Enterprise possessed and continues to possess a common purpose and goal, a membership, organizational structure, and ongoing relationships between the entities with sufficient longevity to permit and enable pursuit of the Enterprise's purpose and long-term objectives through a continuous course of conduct that affected and continues to affect interstate and foreign commerce.

111.    The Enterprise exists separate and apart from its pattern of racketeering activity, inasmuch as Defendant and the Enterprise have multiple goals, not all of which are illegal. The lawful activity engaged in by the Enterprise includes ongoing partnerships to purchase, import, export, distribute, sell, and process wood flooring products that have entered the United States and are sold in the United States in compliance with their labels. Defendant, however, has, since at least 2009, used this Enterprise to conduct the related acts of mail and wire fraud comprising the pattern of racketeering.

112.    Defendant is a "person" under the civil RICO statute because it knowingly conducted and participated in the conduct, the management, and the operation of the Enterprises' affairs, directly or indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

113.    Defendant engaged in such unlawful conduct by using the Enterprise to further its scheme of causing false and misleading information on its product labels to be disseminated by mail, interstate wires, or interstate carriers.

114. Defendant sought to maximize its gain and profit through a pattern and practice of misrepresentation and concealment of the formaldehyde off-gassing of its products that was conducted in violation of applicable laws and regulations.

## The RICO Predicate Acts and Pattern of Racketeering Activity

115. Defendant has conducted, participated in, and operated its business through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

116. Defendant has done so with the purpose of warranting, labeling, and selling its Chinese Flooring products as CARB and EU compliant, when it knew such representations were false when made, and made those representations to enhance its own profits.

117. Defendant's false importation, manufacture, labeling, and sale of its Chinese Flooring products has been part of a deliberately orchestrated scheme to enrich Defendant through increased sales of mislabeled and non-compliant wood flooring products at the expense of defrauded purchasers, including Plaintiffs and the other Class Members.

118. Defendant intended to and did profit from its sales of Chinese Flooring products before its customers, the public, and the United States Government learned that the flooring products had been falsely marketed, manufactured and purveyed.

119. Defendant carried out its scheme in interstate and foreign commerce, making extensive use of the United States mail and wire services to orchestrate its deceptive and unfair sales transactions and promote its sales in the United States.

120. In violation of 18 U.S.C. § 1001, and in furtherance of its unlawful scheme, Defendant has repeatedly and systematically prepared false invoices, letters, labels, and/or other papers that purposefully misstate the CARB and EU compliance of Chinese wood flooring products.

32

121.    In violation of 18 U.S.C §§ 542 and 545, Defendant submitted these false documents to governmental officials, current and prospective customers, and end-users for the purpose of concealing the formaldehyde emissions of its products and introducing those products into interstate commerce.

122.    In violation of 18 U.S.C. § 1341, Defendant, on more than two occasions during the last ten years, used the mails and the services of private or commercial interstate carriers in furtherance of schemes to manufacture, sell and falsely market Chinese Flooring products.

123.    Specifically, Defendant mailed, to current and prospective customers, and to others for reproduction and distribution, solicitations, labels, or invoices for its Chinese Flooring products that affirmatively misstated, or that failed to state under circumstances that have a tendency to mislead, the CARB and EU compliance of the goods.

124.    Defendant has exclusive possession, custody, and control over the documents and other evidence reflecting the aforementioned mailings.

125.    In violation of 18 U.S.C. § 1343, Defendant, on more than two occasions during the last ten years, used the interstate and international wires to transmit purchase orders of its Chinese suppliers for mislabeled Chinese Flooring products.

126.    In violation of 18 U.S.C. § 1343, Defendant, on more than two occasions during the last ten years, used the interstate and international wires to transmit instructions to its Chinese suppliers or intermediaries regarding the shipment of mislabeled Chinese Flooring products.

127.    In violation of 18 U.S.C. § 1343, Defendant, on more than two occasions during the past ten years, used the interstate wires to transmit or convey quotations for Chinese Flooring products to customers, which misrepresent the formaldehyde emissions of these products.

128. With the exception of the wire transmissions referenced herein, Defendant has exclusive possession, custody and control over most documents and other evidence reflecting the aforementioned wire transmissions.

### Relatedness and Continuity of the Racketeering Activity

129. The foregoing enterprise existed and operated continuously since at least 2009 and likely goes back much further. The enterprise can be expected to continue indefinitely and in the same pattern of racketeering activity, unless this Court intervenes.

130. Defendant's predicate acts have been so numerous and concerted as to establish the continuity necessary to constitute a pattern and practice of racketeering activity in furtherance of Defendant's scheme, as alleged herein.

131. Defendant's predicate acts are related, in that each act has been designed to further, and has been an integral part of, Defendant's scheme, and has been intended to achieve its unlawful purpose.

132. The activities of Defendant's enterprise have had a significant impact upon interstate and foreign commerce; millions of dollars' worth of mismarked or mislabeled Chinese Flooring products have been manufactured by Lumber Liquidators outside of the United States and shipped in interstate and foreign commerce to Defendant's retail stores and, eventually, to its customers.

133. Defendant's communications with and payments to the Chinese timber processors and their intermediaries have moved in interstate and foreign commerce.

134. Defendant has derived substantial income from its scheme alleged herein.

135. As set forth above, Defendant and its co-conspirators have devised, set in motion, and brought to fruition schemes, namely: willfully and knowingly misrepresenting material facts

regarding the character and quality of Defendant's Chinese Flooring products for the purposes of allowing the shipment and importation of these products and for the purposes of inducing customers to purchase them.

136.   Consumers, purchasers, and other third parties relied on Defendant's scheme, resulting in harm to Plaintiffs and the other Class members.

137.   Plaintiffs have been damaged by Defendant's mailing or wire transmissions of solicitations that fail to disclose the lack of CARB and EU compliance of Defendant's Chinese Flooring products.  Plaintiffs were injured as a result of purchasing these products.

### COUNT 2
### (Violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961, *et seq.* - Lacey Act)

138.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

139.   Plaintiffs bring this claim individually and on behalf of the other Class members against Lumber Liquidators

140.   RICO provides:

It shall be unlawful for any persons employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962(c).

141.   The relevant time period for Defendant's pattern of racketeering stems from at least the year 2009, and likely earlier but at this point in discovery as yet unknown, and continues to the filing of this RICO Class Action Complaint.

142.   Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

### The RICO Enterprise - Lacey Act

143.    Defendant has used an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), to carry out their pattern of racketeering activity. This enterprise consists of Lumber Liquidators, Russian timber sellers, Chinese flooring manufacturers, and other entities that were associated together for the common purpose of illegal manufacturing and importing into the United States and selling to consumers falsely advertised Chinese Flooring products that failed to comply with the Lacey Act.  This Enterprise possessed and continues to possess a common purpose and goal, a membership, organizational structure, and ongoing relationships between the entities with sufficient longevity to permit and enable pursuit of the Enterprise's purpose and long-term objectives through a continuous course of conduct that affected and continues to affect interstate and foreign commerce.

144.    The Enterprise exists separate and apart from its pattern of racketeering activity, inasmuch as Defendant and the Enterprise have multiple goals, not all of which are illegal.  The lawful activity engaged in by the Enterprise includes ongoing partnerships to purchase, import, export, distribute, manufacture, sell, and process wood flooring products that have entered the United States and are sold in the United States in compliance with the Lacey Act.  However, Defendant has, since at least 2009, used this Enterprise to conduct the related acts of mail and wire fraud comprising the pattern of racketeering.

145.    Lumber Liquidators is a "person" under the civil RICO statute because it knowingly and illegally conducted and participated in the conduct, the management, and the operation of the Enterprises' affairs, directly or indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Defendant engaged in such unlawful conduct by using the Enterprise to further its scheme of causing false and misleading information on its

product labels to be disseminated by mail, interstate wires, or interstate carriers. Defendant sought to maximize its gain and profit through a pattern and practice of misrepresentation and concealment of the illegal harvesting of its timber products that was conducted in violation of applicable laws and regulations.

### The RICO Predicate Acts and Pattern of Racketeering Activity

146.    Defendant has conducted, participated in, and operated its business through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Defendant has done so with the purpose of warranting, labeling, and selling its Chinese wood flooring products as harvested in compliance with the law, when it knew such representations were false, and enhancing its own profits.

147.    Defendant's scheme of importing, labeling, and selling its Chinese Flooring products has been part of a deliberately orchestrated scheme to enrich Defendant through increased sales of mislabeled wood flooring products at the expense of defrauded purchasers, including Plaintiffs and the other Class members.

148.    Defendant intended to and did profit from its sales of Chinese wood flooring products before its customers, the public and the United States Government learned that the flooring products had been illegally harvested and purveyed.

149.    Defendant carried out its respective scheme in interstate and foreign commerce, making extensive use of the United States mail and wire to orchestrate its illegal sales transactions and promote its sales in the United States.

150.    In violation of 18 U.S.C. § 1001, and in furtherance of its unlawful scheme, Defendant has repeatedly and systematically prepared false Customs entry declarations, invoices,

37

affidavits, letters, labels, and/or other papers that purposefully misstate the sourcing compliance of its Chinese Flooring products in violation of the Lacey Act.

151.  In violation of 18 U.S.C §§ 542 and 545, Defendant submitted the false documents to Customs officials, current and prospective customers, and end-users for the purpose of concealing the illegal sourcing of its products and introducing those products into interstate commerce.

152.  In violation of 16 U.S.C. §§ 3371, *et seq.* (Lacey Act), and in furtherance of its unlawful scheme, Defendant, along with co-conspirators, has repeatedly and systematically imported or caused to be imported into the United States wood flooring products that were harvested in violation of United States laws regarding the protection of timber.

153.  In violation of 18 U.S.C. § 1341, Defendant, on more than two occasions during the last ten years, used the mails and the services of private or commercial interstate carriers in furtherance of schemes to defraud consumers and to sell illegally harvested Chinese Flooring. Specifically, Defendant mailed, to current and prospective customers, and to others for reproduction and distribution, solicitations, labels, or invoices for Chinese Flooring that affirmatively misstated, or that failed to state under circumstances that have a tendency to mislead, the legal compliance of the harvesting of its goods.

154.  Defendant has exclusive possession, custody, and control over the documents and other evidence reflecting the aforementioned mailings.

155.  In violation of 18 U.S.C. § 1343, Defendant, on more than two occasions during the last ten years used the interstate and international wires to transmit purchase orders of its Chinese suppliers for illegally harvested Chinese Flooring.

156. In violation of 18 U.S.C. § 1343, Defendant, on more than two occasions during the last ten years, used the interstate and international wires to transmit instructions to its Chinese suppliers or intermediaries regarding the shipment of illegally harvested wood flooring products.

157. In violation of 18 U.S.C. § 1343, Defendant, on more than two occasions during the past ten years, used the interstate wires to transmit or convey quotations for flooring products that contain timber illegally harvested in Russia (and processed in China), which fail to disclose the illegal origin of these products.

158. With the exception of the wire transmissions referenced herein, Defendant has exclusive possession, custody and control over most documents and other evidence reflecting the aforementioned wire transmissions.

### Relatedness and Continuity of the Racketeering Activity

159. The foregoing enterprise existed and operated continuously since at least 2009 and likely going back much further. The enterprise can be expected to continue indefinitely and engage in the same pattern of racketeering activity, unless this Court intervenes.

160. Defendant's predicate acts have been so numerous and concerted as to establish the continuity necessary to constitute a pattern and practice of racketeering activity in furtherance of Defendant's scheme.

161. Defendant's predicate acts are related, in that each act has been designed to further, and has been an integral part of, Defendant's scheme, and has been intended to achieve its unlawful purpose.

162. The activities of Defendant's enterprise have had a significant impact upon interstate and foreign commerce; millions of dollars' worth of illegally harvested wood flooring

products have been manufactured outside of the United States and shipped in interstate and foreign commerce to Defendant and, eventually, to its customers.

163.   Defendant's communications with and payments to the Chinese timber processors and their intermediaries have moved in interstate and foreign commerce.

164.   Defendant has derived substantial income from its illegal scheme, as alleged herein.

165.   As set forth above, Defendant and its respective affiliates have devised, set in motion and brought to fruition illegal schemes, namely: willfully and knowingly misrepresenting material facts regarding the legality of Chinese wood flooring products for the purposes of inducing the U.S. Customs Service to allow the importation of these products and for the purposes inducing customers to purchase them.

166.   Consumers, purchasers, the federal government and other third parties relied on Defendant's false representations in solicitations, labels, invoices, and/or quotations for Chinese wood flooring when deciding to purchase Defendant's flooring, thus causing financial harm to Plaintiffs and the other Class members.

167.   Plaintiffs and the other Class members have been damaged by Defendant's mailing or wire transmissions of solicitations that falsely state that Defendant's Chinese Flooring products comply with the Lacey Act.  Plaintiffs and the other Class members were economically injured as a result of purchasing these products.

### COUNT 3
### (Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.* - Formaldehyde)

168.   Plaintiffs incorporate by reference preceding paragraphs numbered 1-102 as if fully set forth herein.

169.    Plaintiffs bring this claim individually and on behalf of the other Class members against Lumber Liquidators..

170.    Plaintiffs and the other Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

171.    Lumber Liquidators is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

172.    Lumber Liquidators flooring purchased separate from the initial construction of the structure constitutes a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

173.    Lumber Liquidators' express warranties and written affirmations of fact regarding the nature of the flooring, including that the flooring was free from defects and was in compliance with CARB and EU formaldehyde standards and all other applicable laws and regulations, constitute written warranties within the meaning of 15 U.S.C. § 2301(6).

174.    Lumber Liquidators breached their warranties by:

    a.  Manufacturing, selling and/or distributing flooring that exceeds the CARB and EU formaldehyde standards;

    b.  Manufacturing, importing, selling and/or distributing flooring that fails to comply with all applicable laws and regulations; and

    c.  Refusing to honor the express warranty by refusing to properly repair or replace the defective flooring.

175.    Lumber Liquidators' breach of its express warranties deprived Plaintiffs and the other Class members of the benefits of their bargains.

176.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

177. Plaintiffs, on behalf of themselves and the other Class members, have notified Defendant of its breach of written warranties and Defendant has failed to adequately cure those breaches. As a direct and proximate result of Lumber Liquidators' breaches of its written warranties, Plaintiffs and the other Class members sustained damages in an amount to be determined at trial. Lumber Liquidators' conduct damaged Plaintiffs and the other Class members, who are entitled to recover damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.

### COUNT 4
### (Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.* – Lacey Act)

178. Plaintiffs incorporate by reference preceding paragraphs 1-102 and 165-175 as if fully set forth herein.

179. Plaintiffs bring this claim individually and on behalf of the other Class members against Lumber Liquidators.

180. Plaintiffs and the other Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

181. Lumber Liquidators is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

182. Lumber Liquidators flooring purchased separate from the initial construction of the structure constitutes a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

183. Lumber Liquidators' express warranties and written affirmations of fact regarding the nature of the flooring, including that the flooring was harvested in compliance with the Lacey Act and all other applicable laws and regulations, constitute written warranties within the meaning of 15 U.S.C. § 2301(6).

184. Lumber Liquidators breached their warranties by:

    d.  Manufacturing, selling and/or distributing flooring that was illegally harvested in violation of the Lacey Act;

    e.  Manufacturing, importing, selling and/or distributing flooring that fails to comply with all applicable laws and regulations; and

    f.  Refusing to honor the express warranty by refusing to properly repair or replace the defective flooring.

185.  Lumber Liquidators' breach of its express warranties deprived Plaintiffs and the other members of the Class of the benefits of their bargains.

186.  The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

187.  Plaintiffs, on behalf of themselves and the other Class members, have notified Defendant of its breach of written warranties and Defendant has failed to adequately cure those breaches.  As a direct and proximate result of Lumber Liquidators' breaches of its written warranties, Plaintiffs and the other members of the Class sustained damages and other losses in an amount to be determined at trial.  Lumber Liquidators' conduct damaged Plaintiffs and the other Class members, who are entitled to recover damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.

## COUNT 5
### (For Breach of Express Warranty -- Formaldehyde)

188.  Plaintiffs incorporate by reference preceding paragraphs 1-102 and 165-185 as if fully set forth herein.

43

189. Plaintiffs bring this claim individually and on behalf of the other Class members against Lumber Liquidators.

190. Lumber Liquidators warranted that its flooring was free of defects when it sold those products to Plaintiffs and the members of the Class as described in this Complaint. Defendant further represented that its flooring products complied with CARB and EU formaldehyde standards and all applicable laws and regulations. Plaintiffs and members of the Class reasonably relied upon these representations.

191. Lumber Liquidators' warranties became part of the basis of the bargain.

192. Lumber Liquidators breached their warranties by:

    a. Manufacturing, selling and/or distributing flooring that exceeds the CARB and EU formaldehyde standards;

    b. Manufacturing, importing, selling and/or distributing flooring that fails to comply with all applicable laws and regulations; and

    c. Refusing to honor the express warranty by refusing to properly repair or replace the defective flooring.

193. Plaintiffs, on behalf of themselves and the other Class members, provided Lumber Liquidators with timely notice of its breach of warranty. Lumber Liquidators was also on notice regarding the excessively high levels of formaldehyde in its flooring from the complaints and requests for refund it received from Class members, Internet message boards and from published product reviews.

194. As a direct and proximate result of Lumber Liquidators' misconduct, Plaintiffs and the other Class members have suffered damages and continue to suffer damages, including economic damages at the point of sale. Additionally, Plaintiffs and the other Class members have either incurred or will incur economic damages at the point of repair in the form of the cost

of repair and/or the cost of purchasing non-defective flooring to replace the Lumber Liquidators' flooring.

195. Plaintiffs and the other Class members are entitled to legal and equitable relief against Lumber Liquidators, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT 6
### (For Breach of Express Warranty – Lacey Act)

196. Plaintiffs incorporate by reference preceding paragraphs 1-102 and 165-193 as if fully set forth herein.

197. Plaintiffs bring this claim individually and on behalf of the other Class members against Lumber Liquidators.

198. Lumber Liquidators warranted that its flooring was free of defects when it sold those products to Plaintiffs and the members of the Class as described in this Complaint. Defendant further represented that its flooring products complied with the Lacey Act and all applicable laws and regulations. Plaintiffs and members of the Class reasonably relied upon these representations.

199. Lumber Liquidators' warranties became part of the basis of the bargain.

200. Lumber Liquidators breached their warranties by:

   a. Manufacturing, selling and/or distributing flooring that was harvested in violation of the Lacey Act;

   b. Manufacturing, importing, selling and/or distributing flooring that fails to comply with all applicable laws and regulations; and

   c. Refusing to honor the express warranty by refusing to properly repair or replace the defective flooring.

201.    Plaintiffs, on behalf of themselves and the other Class members, provided Lumber Liquidators with timely notice of its breach of warranty.  Lumber Liquidators also knew, or was reckless in not knowing, that certain of its products contained timber illegally harvested in Russia.

202.    As a direct and proximate result of Lumber Liquidators' misconduct, Plaintiffs and the other Class members have suffered damages and continue to suffer damages, including economic damages at the point of sale.  Additionally, Plaintiffs and the other Class members have either incurred or will incur economic damages at the point of repair in the form of the cost of repair and/or the cost of purchasing non-defective flooring to replace the Lumber Liquidators' flooring.

203.    Plaintiffs and the other Class members are entitled to legal and equitable relief against Lumber Liquidators, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT 7
### (For Breach of Implied Warranty of Merchantability)

204.    Plaintiffs incorporate by reference preceding paragraphs 1-102 and 165-201 as if fully set forth herein.

205.    Plaintiffs bring this claim individually and on behalf of the other Class members against Lumber Liquidators.

206.    At all times relevant hereto, there was a duty imposed by law which requires that a manufacturer or seller's product be reasonably fit for the purposes for which such products are used and that the product be acceptable in trade for the product description.

207.    Defendant breached this duty by selling flooring to Plaintiffs and the other members of the Class that was not merchantable.

46

208.   Defendant was notified that its product was not merchantable within a reasonable time after the defect manifested itself to Plaintiffs and the members of the Class.

209.   As a result of the non-merchantability of Lumber Liquidators' flooring described herein, Plaintiffs and other members of the Class sustained a loss or damages.

## COUNT 8
### (Violation of Virginia Consumer Protection Act – Formaldehyde)

210.   Plaintiffs incorporate by reference preceding paragraphs 1-102 and 165-206 as if fully set forth herein.

211.   Plaintiffs bring this claim individually and on behalf of the other Class members against Lumber Liquidators.

212.   Lumber Liquidators is a "supplier" within the meaning of the Virginia Consumer Protection Act (Va. Code. 59.1-198).

213.   Lumber Liquidators engaged in "consumer transactions" with Plaintiffs and the other Class members within the meaning of the Virginia Consumer Protection Act (Va. Code 59.1-198).

214.   Plaintiffs and the other Class members purchased flooring from Lumber Liquidators which constitutes "goods" within the meaning of the Virginia Consumer Protection Act (Va. Code 59.1-198).

215.   Lumber Liquidators misrepresented and continues to misrepresent that its goods have or had certain characteristics, are or were of a particular standard, quality, or grade, and committed and continues to commit various other acts of deception,  false pretense, false promise, or misrepresentations in connection with consumer transactions, including, among other things:

47

a. Manufacturing, selling and/or distributing flooring that contains excessive levels of formaldehyde;

b. Manufacturing, selling and/or distributing flooring that exceeds the CARB and EU formaldehyde standards despite the Company's repeated statements to the contrary;

c. Manufacturing, importing, selling and/or distributing flooring that fails to comply with all applicable laws and regulations;

d. Making false and misleading statements and omitting to disclose material information regarding defects in Lumber Liquidators' flooring, including but not limited to the levels of formaldehyde emissions and compliance with CARB and EU formaldehyde standards; and

e. Refusing to properly repair or replace the defective flooring as described herein.

216.    Defendant willfully engaged in deceptive and unfair acts and practices in that it knew or should have known that the methods, acts or practices alleged herein were deceptive, unfair, or unconscionable, or prohibited by law and failed to disclose material information affecting the value of the Lumber Liquidators' Chinese Flooring products purchased by the Plaintiffs and the other Class members.

217.    As a direct and proximate result of Lumber Liquidators' unfair and deceptive trade practices, Plaintiffs and the other Class members were deceived into purchasing Lumber Liquidators' Chinese Flooring products and have been damaged thereby.

## COUNT 9
### (Violation of Virginia Consumer Protection Act – Lacey Act)

218.    Plaintiffs incorporate by reference preceding paragraphs 1-102 and 165-214 as if fully set forth herein.

219.    Plaintiffs bring this claim individually and on behalf of the other Class members against Lumber Liquidators.

220.    Lumber Liquidators is a "supplier" within the meaning of the Virginia Consumer Protection Act (Va. Code. 59.1-198).

221.    Lumber Liquidators engaged in "consumer transactions" with Plaintiffs and the other Class members within the meaning of the Virginia Consumer Protection Act (Va. Code 59.1-198).

222.    Plaintiffs and the other Class members purchased flooring from Lumber Liquidators which constitutes "goods" within the meaning of the Virginia Consumer Protection Act (Va. Code 59.1-198).

223.    Lumber Liquidators misrepresented and continues to misrepresent that its goods have or had certain characteristics, are or were of a particular standard, quality, or grade, and committed and continues to commit various other acts of deception, false pretense, false promise, or misrepresentations in connection with consumer transactions, including, among other things:

    a. Manufacturing, selling and/or distributing flooring that was illegally harvested in violation of the Lacey Act;

    b. Manufacturing, selling and/or distributing flooring that was illegally harvested in violation of the Lacey Act, despite the Company's repeated statements to the contrary;

    c. Manufacturing, importing, selling and/or distributing flooring that fails to comply with all applicable laws and regulations;

    d. Making false and misleading statements and omitting to disclose material information regarding defects in Lumber Liquidators' flooring, including but not limited to information regarding compliance with the Lacey Act; and

    e. Refusing to properly repair or replace the defective flooring as described herein.

224.    Defendant willfully engaged in deceptive and unfair acts and practices in that it knew or should have known that the methods, acts or practices alleged herein were deceptive, unfair, or unconscionable, or prohibited by law and failed to disclose material information

affecting the value of the Lumber Liquidator flooring products purchased by the Plaintiffs and the other Class members.

225.   As a direct and proximate result of Lumber Liquidators' unfair and deceptive trade practices, Plaintiffs and the other Class members were deceived into purchasing Lumber Liquidators' Chinese Flooring and have been damaged thereby.

<u>**COUNT 10**</u>
**(Unjust Enrichment)**

226.   Plaintiffs incorporate by reference preceding paragraphs 1-102 as if fully set forth herein.

227.   Plaintiffs bring this claim individually and on behalf of the other Class members against Lumber Liquidators.

228.   Defendant had knowledge of the warranty defects in the Chinese Flooring, which it failed to disclose to Plaintiffs and the other Class members.

229.   As a result of its wrongful acts and omissions, as set forth above, pertaining to the warranty misrepresentations of the Chinese Flooring and the concealment of the warranty misrepresentations, Lumber Liquidators charged a higher price for the Chinese Flooring than the true value of the Chinese Flooring, and Lumber Liquidators thereby obtained monies that rightfully belong to Plaintiffs and the other Class members, allowing Lumber Liquidators to receive a benefit from Plaintiffs and the other Class members.

230.   Lumber Liquidators realized this benefit from Plaintiffs and the other Class members, and accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the other Class members, who without knowledge of the warranty defects paid a higher price for Chinese Flooring than it was truly worth. Plaintiffs and the other Class members did not confer

these benefits officiously or gratuitously, and it would be inequitable and unjust for Lumber Liquidators to retain these wrongfully obtained profits.

231.   Plaintiffs and the other Class members are therefore entitled to restitution in an amount to be determined at trial.

## VII. <u>DAMAGES AND OTHER RELIEF</u>

232.   Lumber Liquidators' acts and omissions were a proximate cause of the damages to Plaintiffs and the members of the Class.  Class Members have sustained financial losses associated with their purchase of Lumber Liquidators' flooring as they failed to obtain the benefit of their bargain, would not have purchased the products, and/or would have paid less for them if they had known the truth.  Other financial damages include installation and removal costs, remediation costs, restocking fees, loss of use, diminished value, and other losses.  At this time, Plaintiffs seek damages individually and on behalf of the other Class members and equitable relief as previously alleged in this Complaint.

233.   Plaintiffs, individually and on behalf of the other Class members, seek their reasonable and necessary attorneys' fees and costs incurred in connection with this suit.

234.   Plaintiffs, individually and on behalf of the other Class members, seek pre-judgment and post-judgment interest, at the highest rates allowed by law, on the damages awarded.

## VIII. <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that the Court enter judgment in their favor as follows:

        a.  certifying the Class and appointing Plaintiffs and their counsel to represent the Class;

b.  declaring that Lumber Liquidators is financially responsible for notifying all Class Members about the defects described herein;

c.  enjoining Lumber Liquidators from further deceptive sales practices with respect to the Company's flooring;

d.  awarding Plaintiffs and the other members of the Class their actual damages, consequential damages, specific performance, and/or rescission;

e.  directing Lumber Liquidators to repair and/or replace all defective and/or misbranded flooring at no cost to the Class members;

f.  awarding Plaintiffs and the other Class members pre-judgment and post-judgment interest;

g.  awarding Plaintiffs and the other Class members reasonable attorneys' fees and costs of suit, including expert witness fees;

h.  awarding Plaintiffs and the other Class members punitive damages, where authorized;

i.  granting leave to amend the Complaint to conform to the evidence produced through discovery and/or at trial; and

j.  awarding such other and further relief as this Court may deem just and proper.

## IX. **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: December 3, 2013                    Respectfully submitted,

*Attorneys for Plaintiffs and the Proposed Class*
By Counsel

Bernard J. DiMuro
VSB No. 18784
*Attorneys for Plaintiffs and the Proposed Class*
**DIMUROGINSBERG, PC**
1101 King Street, Suite 610
Alexandria, Virginia 22314
Tel: (703) 684-4333
Fax: (703) 548-3181
bdimuro@dimuro.com

52

Jason M. Leviton
Whitney E. Street
Steven P. Harte
Erica G. Sorg
**BLOCK & LEVITON LLP**
155 Federal Street, Suite 1303
Boston, Massachusetts 02110
Tel:  (617) 398-5600
Fax:  (617) 507-6020
Jason@blockesq.com
Whitney@blockesq.com
Steven@blockesq.com
Erica@blockesq.com

James J. Pizzirusso
Kristen M. Ward
**HAUSFELD LLP**
1700 K Street NW, Suite 650
Washington, DC  20006
Tel:  (202) 540-7200
Fax:  (202) 540-7201
jpizzirusso@hausfeldllp.com
kward@hausfeldllp.com

Adam J. Levitt
**GRANT & EISENHOFER P.A.**
30 North LaSalle Street, Suite 1200
Chicago, Illinois  60602
Tel:  (312) 214-0000
Fax:  (312) 214-0001
alevitt@gelaw.com

Robert G. Eisler
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, Delaware  19801
Tel:  (302) 622-7000
Fax:  (302) 622-7100
reisler@gelaw.com

*Attorneys for Plaintiffs and the Proposed Class*